RAY, Administratrix, Respondent, vs. MILWAUKEE AUTO-
MOBILE INSURANCE COMPANY, LIMITED, MUTUAL, Ap-
pellant.

STENSON and others, Respondents, vs. SAME, Appellant.

*January 9—February 7, 1939.*

For the appellant there was a brief by *Richmond, Jackman, Wilkie & Toebaas* of Madison and *Regan & McCue* of Milwaukee, and oral argument by *Lawrence E. Hart* of Madison.

For the respondents there was a brief by *Hall, Baker & Hall* of Madison, attorneys, and *Max Lidschin* of Chicago, Illinois, of counsel, and oral argument by *Paul Griffith* of Madison.

ROSENBERRY, C. J.   On November 8, 1936, William deHartog was driving south on Mannheim road in Cook county, Illinois, in an Oldsmobile sedan.   Mannheim road is an arterial highway with concrete surface and four traffic lanes.   At the time of the accident, Henry deHartog, a brother of William, was sitting on the front seat to the right-hand side of the driver.   The undisputed testimony is that as the deHartog car approached the intersection of Mannheim road with Grand avenue which runs in substantially an east-and-west direction, and is also a concrete surfaced highway with four traffic lanes, the speed of the car was between thirty and thirty-five miles per hour.   As they approached the intersection there was a sign on the right-hand side

"Intersection. Slow down." According to the testimony of Henry deHartog, the driver slowed the car down to a speed of between twenty to twenty-five miles an hour. As they approached the intersection, Henry looked to the west or his right and just as he looked back straight ahead the collision occurred.

The other car involved in the accident was a Hudson, and was being driven by Louis Fenner, proceeding west on Grand avenue. On the front seat with him were his son at his right and at the right of the son, Mrs. Stenson. On the rear seat Mrs. Ryckman sat directly back of Mr. Fenner, Mr. Ryckman directly back of Mrs. Stenson. Between Mr. and Mrs. Ryckman sat their son, Charles A. Ryckman.

There is some conflict in the evidence with respect to the course of the Fenner car, as it approached the intersection from the east. We accept that version of the evidence most favorable to the plaintiffs inasmuch as the jury found in their favor in part. Mrs. Stenson and Mr. Fenner testified upon the trial. They agree that as they approached the intersection some distance back from it, possibly sixty to one hundred feet east of the intersection, they were sideswiped by a car and stopped. Mr. Fenner got out of the car in an endeavor to get the number of the automobile that had struck his car. Mrs. Stenson got out and wiped the snow off the windshield on her side of the car. Mr. Fenner also wiped the snow off the windshield on his side. It appears without contradiction that there was a heater in operation in the car at the time, which, as already stated, contained six persons. This caused the interior of the car to steam, and Mrs. Stenson was continuously engaged in wiping the moisture from the inside of the windshield and off the window on the right-hand side of the car near which she sat. They both testify that it was snowing at the time. They stopped with the rear of the car near the arterial stop sign. The stop sign was twenty feet east of the east line of the concrete on Mannheim

road. The evidence is undisputed at this point that persons situated as were Mr. Fenner and Mrs. Stenson would have an unobstructed view to the right and left, up and down Mannheim road for a long distance, many hundreds of feet. Mrs. Stenson testified:

"We got to the corner and we stopped, there is a stop sign there and we stopped right near Mannheim road, right before we got to the intersection. We stopped and we looked, and we were ready to go across, and just got half way across, and that is all I know. . . . When I made the observation I couldn't see very far in a northerly direction. You could see just about as wide as the road was, that was about all. You couldn't see no more. You could see as far north as the width of the road. Then we started up. Whatever happened after that I don't know. . . .

"The windshield wiper cleaned off the snow. Where it operated we could see through the windshield. He [Fenner] would have a view ahead of him, but no view to the side. I wiped off the glass on the right side of the car but not on the left. I had the rag in my hand and I kept on wiping, every time I couldn't see. In other words, the conditions were so bad that as we drove along I had to be continually wiping the steam off the glass on the right side of the car. If that was not done I couldn't see anything."

Fenner testified: "The visibility was poor. I would say from thirty to forty feet. . . . When I got to the intersection I stopped. I know I passed the yellow sign [arterial sign] and I know the sign isn't over twelve feet from the edge of the pavement, and I imagine that the rear of the car was even with the yellow stop sign. I made a complete stop at that point. . . . I started up I think between fifteen to twenty miles an hour in second gear. It seemed to me as though I was over half way across. As I started across I was on the right-hand side of Grand avenue. On the north side. I saw just a flash. . . . I saw no car."

On cross-examination he testified:

"When I stopped and looked to my right I looked out of the windshield. I did not look out of the glass on the side of

the car. I never do that. . . . When I looked to my right I could see a distance of thirty to forty feet away from my car. I saw no car within that distance."

Both witnesses gave other testimony substantially to the same effect. The collision occurred while the deHartog car was in the westerly lane of Mannheim road near the center of the intersection of Grand avenue with the westerly lane of Mannheim road. There is a dispute as to which car was struck by the other. It appears that just at the instant before the impact, deHartog attempted to turn his car to the right. In the collision the Fenner car was turned around so as to face to the northeast and stopped near the southwest corner of the intersection. The deHartog car traveled to the southwest and stopped on the south side of Grand avenue fifty to seventy-five feet to the west of the intersection.

Upon the trial the jury found that William deHartog was negligent with reference to speed, but that that negligence was not a cause of the collision. They found that he was negligent as to lookout and that lookout was a cause of the collision. They also found that he was not negligent as to control. It was the contention of the defendant upon the trial, and it is its contention here, that there is no evidence in the record to sustain the findings of the jury that William deHartog did not use ordinary care as to lookout. DeHartog died as a result of the accident, and there is no direct evidence as to what he was doing with respect to lookout immediately preceding the accident. Under such circumstances the presumption is, nothing appearing to the contrary, that he was in the exercise of ordinary care. *Smith v. Green Bay* (1937), 223 Wis. 427, 271 N. W. 28. The plaintiffs point to no direct evidence indicating a want of lookout on the part of deHartog and we find none in the record. Their contention is that because there is a conflict in the evidence as to the visibility and weather conditions on the morning in question,

there is a question for the jury on the matter of lookout. While Mrs. Stenson and Mr. Fenner testified, as already stated, that they could not see more than thirty or forty feet, the overwhelming testimony of others is that persons in other situations could see from three hundred to six hundred feet. The condition of the Fenner car no doubt accounts for the discrepancy in the testimony. With the exception of Henry deHartog all other witnesses for the defendant are wholly disinterested.

It is considered therefore that the testimony of Mrs. Stenson and Mr. Fenner as to what they could see out of the Fenner car raises no conflict as to what others could see in other situations. It is argued on behalf of the plaintiffs that if William deHartog had been maintaining a proper lookout he would have seen the Fenner car and would have stopped in time to avoid the accident. It is considered that the reasoning on which this conclusion is based is not sound. There is evidence in the case tending to show that the Fenner car did not stop at the arterial, but in view of the jury's findings we shall not consider that aspect of the case and assume that it did stop, that it started up as Fenner testified it did at the rate of fifteen to twenty miles an hour. At the time it started to cross the intersection the Fenner car must have been in plain view of deHartog. · Upon this point the trial court correctly instructed the jury as follows:

"In connection with this question [the negligence of William deHartog] you are instructed that as he approached and entered the intersection in question, William deHartog was entitled to assume that the operator of any vehicle approaching the intersection would comply with the law relating to the operation of motor vehicles and would exercise ordinary care. He was entitled to rely on this assumption until he knew or in the exercise of ordinary care should have known that the driver of an approaching vehicle was not complying with the law or exercising ordinary care.

"Among other things Mr. deHartog was entitled to take into consideration the fact that he was driving on an arterial highway and that all vehicles entering upon the highway he was driving on were required to stop and yield the right of way to traffic on the arterial, and he was entitled to assume that the driver of any car entering the arterial would comply with his duty in respect to stopping and yielding the right of way and to rely on this assumption until he knew or in the exercise of ordinary care should have known that the approaching driver was not fulfilling his duty."

DeHartog was traveling approximately between thirty and forty feet west of the east line of Mannheim road. He had the right of way over traffic coming from his left. Traffic coming from his right had the right of way as against traffic coming from the north except as traffic from his right was controlled by the arterial sign. Manifestly deHartog could not look in both directions at once. If he looked to his left and saw the Fenner car stopped, he had, as the trial court said, the right to assume that it would yield him the right of way. The fact that he continued on into the crossing does not sustain an inference that he did not look, or if he looked, did not see the Fenner car. If he then turned his attention to the traffic from the right, there is no fact upon which an inference can be based that he did not maintain a proper lookout. From the time the Fenner car stopped for a fraction of a second, as Fenner says, until the time of the accident, must have been approximately two seconds. During the two seconds the deHartog car traveled somewhere between fifty to sixty feet. We see no fact in this evidence from which an inference can be drawn that deHartog in any way failed to maintain a proper lookout; hence there is nothing to overcome the presumption in his favor that he exercised due care under the circumstances. The occupants of the Fenner car admit that they could not see more than thirty to forty feet. Nevertheless they entered upon the intersec-

tion at a speed of fifteen to twenty miles an hour, knowing that a car traveling at a lawful rate of speed coming from the north might appear. No inference can be drawn from the condition of the cars. Any inference based on the condition of the cars must rest in doubt, speculation, and conjecture, and therefore not of sufficient weight to destroy the presumption of law which existed in favor of deHartog. It is equally true that there is no evidence to sustain the finding that deHartog was proceeding at an unlawful or unreasonable rate of speed. The laws of Illinois prescribe no speed limit. Certainly approaching an arterial crossing at the rate of thirty to thirty-five miles an hour and slowing down to twenty to twenty-five miles an hour to cross the intersection cannot under the conditions that existed at the time of this accident be considered unreasonable.

We therefore conclude that the evidence fails to sustain the verdict. The jury having acquitted deHartog of all other charges of causal negligence, the judgments must be reversed. Many other questions are raised in the case, but in the view that we take of the evidence it is not necessary to consider or decide them.

*By the Court.*—The mandate in each case is that the judgment appealed from is reversed and the record remanded to the trial court with directions to dismiss the complaint.