**FEINSINGER v. BARD.**

**FEINSINGER v. CENTURY INDEM-NITY CO.**

**FEINSINGER v. IRVING W. RICE & CO., Inc.**

Nos. 10453, 10454, 10455.

United States Court of Appeals
Seventh Circuit.

Feb. 25, 1952.

Rehearing Denied April 16, 1952.

E. L. Everson, John C. Whitney, Green Bay, Wis., Frank M. Coyne, R. J. Sutherland and Ralph E. Axley, all of Madison, Wis., Everson, Ryan, Whitney & O'Melia, Green Bay, Wis., for Frances Bard.

Clifford G. Mathys, Willard S. Stafford, John Ernest Roe, Rieser, Mathys, McNamara & Stafford, and Roberts, Roe, Boardman, Suhr & Bjork, all of Madison, Wis., for plaintiff-appellee.

Before MAJOR, Chief Judge, and KERNER and LINDLEY, Circuit Judges.

MAJOR, Chief Judge.

The three defendants mentioned in the caption appeal separately from a judgment favorable to the plaintiff in the amount of $45,000, entered February 20, 1951. The action was instituted to recover for personal injuries sustained by the plaintiff resulting from a collision between two automobiles which occurred on the 21st day of February, 1950, on United States Highway 41, in Brown County, Wisconsin. One of the cars, driven by Stanley Bard, was traveling south, and the other, driven by Carl Wedell, was traveling north. Both Bard and Wedell were instantly killed. Plaintiff was a guest passenger in the car driven by Wedell.

The appellant Frances Bard, mother of the decedent Stanley Bard, was duly appointed administratrix of his estate by the Surrogate's Court of the County of Westchester, State of New York, and qualified

as such. The appellant Irving W. Rice & Co., Inc. (hereinafter referred to as Rice) was alleged and found to have been the employer of Stanley Bard, deceased, and liable as such. The appellant Century Indemnity Company (hereinafter referred to as Century) carried liability insurance on the car driven by Wedell, with coverage limited to $15,000. Its liability is dependent upon the negligence alleged and found as to the operation of the car by its insured.

Each of the defendants present a contested issue peculiar to its own situation. Other issues, perhaps of less importance, are urged by all defendants.

Bard presents the legal issue as to whether a Wisconsin statute, providing for substituted service on the Commissioner of the Motor Vehicle Department of Wisconsin in an action against a personal representative of a deceased New York motorist, arising out of an accident occurring in Wisconsin, is constitutional. Rice presents the issue as to whether the evidence supports the finding that at the time of the collision in question Stanley Bard was in its employment. Century presents the issue as to whether the evidence sustains a finding that Wedell was negligent in respect to lookout or management and control so as to render liability on its part, and whether the evidence sustains a finding of no assumption of risk on the part of the plaintiff.

Other contested issues in which the defendants find more or less common ground relate to the *voir dire* examination of the jury by the court, argument by plaintiff's counsel to the jury, instructions given by the court and the amount of damages awarded by the jury.

We shall first consider the question raised by Bard, that the Wisconsin statute which authorizes service against a non-resident administrator is unconstitutional. Service was had on June 7, 1950, by filing a copy of the summons and a copy of plaintiff's complaint with B. L. Marcus, Commissioner of the Motor Vehicle Department of Wisconsin, pursuant to the provisions of Sec. 85.05(3) Wisconsin Statutes, which, so far as here material, provides: "The use and operation by a nonresident of a motor vehicle over the highways of Wisconsin shall be deemed an irrevocable appointment binding upon his executor, administrator or personal representative by such nonresident of the commissioner of the motor vehicle department to be his true and lawful attorney upon whom may be served all legal processes in any action or proceeding against him, or his executor, administrator or personal representative, growing out of such use or operation resulting in damage or loss to person or property, and said use or operation shall be a signification of his agreement that any such process against him, or his executor, administrator or personal representative, which is so served shall be of the same legal force and validity as if served on him personally, or his executor, administrator or personal representative. Service of such process shall be made by serving a copy upon the commissioner of the motor vehicle department or by filing such copy in his office, together with a fee of $2, and such service shall be sufficient service upon the said nonresident, or his executor, administrator or personal representative * * *."

█ Bard answered plaintiff's complaint on June 27, 1950, without raising any question as to venue or jurisdiction. On March 12, 1951, the day the trial commenced, Bard, pursuant to a notice given ten days prior thereto, raised for the first time what she asserts was lack of jurisdiction because of the unconstitutionality of the aforesaid statutory provision. Plaintiff argues that Bard by her answer to the complaint waived any defect in service of process. Bard contends that it was a jurisdictional question and could be raised at any time. In our view, the court had jurisdiction of the subject matter of the suit and any jurisdictional issue related only to the question as to whether Bard was properly before the court. In other words, Bard raised a question as to venue, and we need not cite authority for the well established rule that a defect in venue may be waived.

█ However, we need not rest our decision on this somewhat dubious ground, because we think that the court properly sustained the constitutionality of the Act. True, the Wisconsin Supreme Court has not directly passed upon the provision in

controversy but in view of State ex rel. Ledin v. Davison, 216 Wis. 216, 256 N.W. 718, 96 A.L.R. 589, there is every reason to believe that it will sustain the provision when the question is presented. In that case, the court held that a statute which authorized service upon a non-resident motor vehicle operator was not applicable to the administrator of such operator's estate, but at the same time set forth specifically and in detail the phraseology of an amendment which would evidence legislative intent to authorize service upon the personal representative of a deceased motorist. Thereafter, the Wisconsin legislature specifically and verbatim adopted the phraseology suggested by the Supreme Court in the form of the provision as it now exists. It hardly seems likely that the Supreme Court would now hold unconstitutional a legislative enactment made in conformity with the precise suggestion which it made.

Three courts of last resort have sustained the constitutionality of a provision either exactly or substantially in the same form. Leighton v. Roper, 300 N.Y. 434, 91 N.E. 2d 876, 18 A.L.R.2d 537; Oviatt v. Garretson, 205 Ark. 792, 171 S.W.2d 287; Plopa v. DuPre, 327 Mich. 660, 42 N.W.2d 777. And it is significant to note that the Arkansas court in sustaining a similar provision relied heavily upon the decision of the Wisconsin court in State ex rel. Ledin v. Davison, supra. As to that case, it stated at page 291 of 171 S.W.2d: "The Wisconsin court thereby clearly recognized that such a statute was within the legislative power. In fact, it would seem possible that the draftsmen of our Act 40 of 1941 had before them the Wisconsin decision in preparing the draft of our Act 40 of 1941. So, we hold that the service upon the executor of the estate of Mrs. Emma Tarnutzer was legal and valid."

Bard relies heavily upon Knoop v. Anderson, D.C., 71 F.Supp. 832, which admittedly is the only case in support of her contention. We agree that the court in that case gave the question careful and extended consideration, but we think the reasoning is unsound and, in any event, it is, as we have shown, contrary to the weight of authority.

Bard argues that a New York court, when and if enforcement is sought in that State, would probably refuse to recognize the judgment under the full faith and credit clause of the Federal Constitution. Leighton v. Roper, supra, is cited in support of this argument but it is of little, if any, benefit to Bard on the instant question. In that case, the court held that a New York State court, under a similar statute, had jurisdiction of an Indiana administrator of a deceased Indiana motorist. True, the court refused to pass upon the matter of the enforceability of the judgment in the Indiana courts, with the observation that such enforcement would depend upon the appropriate procedure of the State of Indiana. We agree with this view, which means that the matter of the enforceability of the judgment in the instant suit in a court of New York must be determined there and not here. We reject the contention of Bard that the court was without jurisdiction.

The principal contention of defendant Rice is that it sustained no employment relationship with Bard at the time of the collision and that the latter was acting in the capacity of an independent contractor. The jury by its special verdict found that Bard was an employee of Rice. Thus, the only question on review is whether there is any credible evidence in support of such finding. Obviously, this is an important question to Rice because its liability depends upon the answer.

Inasmuch as Bard is dead, most of the evidence as to the relationship which he sustained to Rice was furnished by the latter's sales manager, together with a mass of documentary evidence consisting mostly of letters and messages exchanged between the sales manager and Bard. Admittedly, Bard was a sales representative or commissioned salesman, selling merchandise for and on behalf of Rice, and his remuneration consisted of a commission on goods sold and delivered. Bard was assigned a territory consisting of several Midwestern and New England states, owned the car which he used in his work and paid the expenses thereon. He worked pretty much as he pleased, carried no merchandise with him and took orders from customers as a rep-

resentative and on behalf of Rice. The sales manager for Rice conceded that Bard was an employee in 1948, but it is claimed this status was severed in 1950, when the method by which Bard was compensated was changed from a salary to a commission basis. At the same time, it was conceded that Bard performed the same duties during the entire period that he worked for Rice and that this relationship continued and was in existence at the time of the accident. The sales manager testified that he was in charge of all the men who sold for his company, including Bard, and that they were under his supervision, and further, that Bard on the day of the accident was making a trip for the purpose of selling Rice's merchandise. Rice made withholding deductions from the compensation received by Bard, on the theory that he was an employee.

We have mentioned only a few of the incidents relative to the relationship which Bard sustained to Rice. We think no good purpose could be served, and certainly it would unduly prolong this opinion, to state, even without discussion, all the incidents disclosed in the testimony of the sales manager and in the voluminous documentary evidence. It is sufficient to say that we have carefully examined the testimony in this respect and conclude that the question of the relationship was properly submitted to the jury and that its answer must be accepted. It appears that the Supreme Court of Wisconsin, no different from courts generally, holds that such a question is one of fact and that a finding by a jury must be accepted by a reviewing court if supported by the evidence. In the recent case of Thurn v. LaCrosse Liquor Co., 258 Wis. 448, 46 N.W.2d 212, the court, on facts quite similar to those of the instant case, upheld the finding of a jury on such an issue. The contention of Rice that there is no substantial basis for the finding by the jury on this issue is rejected.

This brings us to the contention by Century that there is no substantial support for the finding of negligence on the part of Wedell, its insured, and as a consequence the judgment against it cannot stand. Without doubt, this question presents a difficult and perplexing problem. In attempting its solution, we have carefully studied the briefs of the respective parties and read all the testimony pertaining to the issue, as well as numerous decisions of the Wisconsin Supreme Court treating of similar situations. We are satisfied from a reading of such cases that the rights and obligations of the driver of a motor vehicle upon the highways of Wisconsin is, generally speaking, no different than in other jurisdictions. There may be an exception to this broad statement in the rule applicable to the duty which the driver of a motor vehicle owes to a guest passenger, such as was the plaintiff in the instant case.

We recognize that in evaluating the evidence relative to the asserted negligence of Wedell, plaintiff is entitled to have it considered in the light most favorable to him, including all reasonable inferences which may be drawn therefrom. As to the circumstances directly connected with the accident, there was the testimony of only two witnesses, plaintiff and Joseph Knoll, the latter of whom was driving behind the car driven by Wedell. It is not disputed but that the highway at and in the vicinity of the point of the accident was hazardous for driving. The weather was cold, the wind was high, it was snowing and at the point of the accident the highway was covered with ice. The concrete highway on which the collision occurred was of a width of twenty-two feet, with a gravel shoulder some nine feet in width on each side of the concrete. These shoulders at that time were covered with snow to a depth of from two to six inches and at some points the snow was considerably drifted.

It may be of some importance to refer briefly to plaintiff's testimony as it pertains to the trip prior to the immediate time of the collision. Plaintiff, with Wedell at the wheel, left Madison, Wisconsin, at 10 o'clock in the morning, bound for Marinette, Wisconsin, and up to the point of the accident had driven about 120 miles. All during the trip it was windy and snowing. At some points there were snow and ice on the highway and at others it was clear. Sometime during the trip, as testified to by plaintiff, "At my suggestion, Wedell

stopped his car \* \* \* to test the pavement out. \*· \* \* We chose a flat, open stretch and we stopped from the speed which we were then traveling without any difficulty." Prior to that time they had been driving at a speed of 45 to 50 miles an hour but afterwards slowed down to 35 or 40. The time consumed in traveling the thirty-seven miles immediately preceding the accident was an hour and ten or fifteen minutes. Vision ahead was limited and was variable, depending upon the wind and snow. Wedell's car was equipped with two windshield wipers and they were kept in operation during the trip. The test disclosed that Wedell could stop his car under existing conditions in five hundred feet.

Plaintiff testified, "I was satisfied with the speed Mr. Wedell was driving and the way he was handling his car for the most part of the journey," and that as they approached the scene of the accident "There was no difficulty with vision, either before the driver or myself. I could see clearly through the lefthand window, that is, to the driver's left, and I could see clearly through the right hand window to my right. I was sitting in the right of the car. \* \* \* Within the last half mile before the collision I would say Mr. Wedell was driving 35 miles an hour, certainly not over 40 miles an hour. He was operating in his own right lane. If anything he was over to the right or east side of his lane." He further testified that he first saw the Bard car when he was at a distance of between six hundred and seven hundred and fifty feet. That was given as his best judgment, and it might have been more and might have been less, and "It seemed to me that when I first saw the Bard car it was directly in front of us. It certainly was not over in the other lane where it should have been.

Whether it was wholly in our lane or in the center I can't say with certainty. It seemed to me to be directly in front of us. From the time I first saw the Bard car until the time of collision it seemed to pursue the same course, directly toward us. I did not observe it veering at any time. I don't believe it slowed down. As to its speed, I have an opinion as to the relative speed in that the Bard car was coming a good deal faster than we were going." Plaintiff further testified that the Wedell car continued on its course without turning to the right or the left and with no indication that the brakes were applied and, "When I saw the Bard car I immediately turned to look at Wedell to see whether he was looking and he was—he seemed to be looking directly ahead. I had no reason to think he wasn't looking in the same direction I was. \* \* \* My best estimate would be roughly seven seconds had elapsed from the moment the Bard car entered my vision until actual impact."

·Thus, considering the evidence most favorable to the plaintiff, which the jury had a right to do, it all simmers down to a situation wherein Wedell just prior to the collision and for many miles prior thereto was driving at a rate of speed evidently agreeable to and perhaps suggested by the plaintiff, with knowledge on the part of each that a distance of five hundred feet would be required to bring the car to a stop by application of the brakes, where Wedell was driving entirely on his side of the highway when suddenly a car was seen approaching from the opposite direction at a distance of seven hundred feet on the wrong side of the highway, and traveling at a rate of speed "a good deal faster" than that of Wedell.[1]

I. For the purpose of this discussion, we are not taking into consideration the testimony of the disinterested witness, Knoll, who was traveling from one hundred and fifty to two hundred feet back of Wedell. He was traveling with his headlights on as a safety measure and with two wheels on the shoulder so that he could get better traction. He also saw the Bard car approaching and witnessed the impact. He stated that when he first saw the

Bard car it was one hundred and fifty to two hundred feet ahead of the Wedell car and between one-third and two-thirds into the lane of the Wedell car, that the Bard car was traveling in an angular direction toward Wedell until at the time of the impact it was completely on the wrong side of the road and that the two cars collided head-on. He also testified that it was a heavy snowstorm and that four hundred feet was the extent of visi-

Plaintiff on cross-examination gave a rather graphic description of what he did during the seven seconds which intervened between his discovery of the rapidly approaching Bard car and the impact. He stated, "I looked at the Bard car to determine its location for probably a couple of seconds, more or less. * * * I would say it would more likely be more than two seconds. One would have to look at least a second to be sure he saw something coming. The first thing I did after seeing the Bard car clearly was to turn to Mr. Wedell to see what he was doing. * * * I looked at him for a second or so then immediately turned back and put my arms to my eyes. * * * Whether I actually saw the Bard car again after I turned I don't know. * * * · After having put my arms up to shield my eyes in case there was an accident and in a few moments, one, two or three seconds, the impact occurred."

 Under the situation thus shown, it is our judgment that there is no support for the jury finding that Wedell was negligent in the operation of his car, either as to maintaining a proper lookout or as to its control and management. This conclusion rests upon logic and common sense and is amply fortified by the Wisconsin cases. In the first place, there is a presumption that the deceased Wedell exercised due care and caution for his own safety. As was stated in Seligman v. Hammond, 205 Wis. 199, 203, 236 N.W. 115, 116: "This in itself is a very substantial presumption, and while it does not constitute affirmative evidence that due care was exercised, it does require proof to the contrary in order to remove its persuasive force. While the physical situation showed that he was on the wrong side of the road, this presumption intervened to prevent the conclusion that he was there by reason of his own negligence. The right of the plaintiffs to recover could not rest upon the mere fact that he was on the wrong side of the highway. In order for them to recover it was necessary for them to show that he was there by reason of his lack of ordinary care."

· Plaintiff contends that this presumption was dispelled upon proof of the circumstances surrounding the collision. This, however, is an understatement of the proof required to deprive a deceased· person of the benefit of the presumption. It disappears only upon the introduction of evidence establishing as a fact that the deceased was negligent. Smith v. Green Bay, 223 Wis. 427, 429, 271 N.W. 28.

Certainly there is no evidence that Wedell failed to keep a proper lookout; in fact, the affirmative evidence is that he was looking straight ahead through a clear windshield. And it must be assumed, we think, that he saw the approaching car as readily as he did the plaintiff. If there was any negligence on his part, it must have been as to control and management and not as to lookout. If Wedell discovered the approaching car at a distance of seven hundred feet and it took him two seconds, as it did plaintiff, to determine its location, he had five seconds remaining to chart his course. It is argued that during that time he could have applied his brakes or he could have turned either to the left or to the right. As to whether the collision could have been avoided by following any of such suggestions is purely a matter of guess and speculation. If he had suddenly applied his brakes on the ice covered highway, he likely would have met with disaster; in any event, he could not have stopped in time to avoid a collision. If he had turned to the left and the driver of the other car had suddenly decided to turn back onto his own side of the highway, the collision would not have been avoided. In that event, Wedell would probably have been charged with negligence for being on the wrong side of the road. True, viewing the situation in retrospect, he might have turned to the right and gotten his car on the shoulder or partly so. It is pointed out that this was a solid shoulder, but it is not shown that Wedell had knowledge of its condition and, moreover, it was covered with snow. It must not be overlooked that Wedell was called upon to act almost instantaneously,

bility. Another witness, Hogan, arrived at the scene of the accident about thirty minutes after its occurrence and testified

that the limit of visibility was about four hundred feet.

without opportunity to weigh the advantage of one course over another.

■ In appraising the situation with which Wedell was suddenly confronted, it should not be overlooked that he had a right to assume that the Bard car approaching him on the wrong side of the highway would return to its own side. Ray v. Milwaukee Automobile Ins. Co., 230 Wis. 323, 329, 283 N.W. 799; DeKeyser v. Milwaukee Automobile Ins. Co., 236 Wis. 419, 425, 426, 295 N.W. 755; Ledvina v. Ebert, 237 Wis. 358, 369, 296 N.W. 110. That Wedell was confronted with a sudden emergency is hardly open to doubt, and whether he had any part in its creation is a matter of speculation. True, it might be argued with some plausibility that he aided in the creation of the emergency in the operation of his car at a speed of 35 to 40 miles an hour under the conditions of the highway. But any doubt on this score must be resolved against the plaintiff for two reasons, (1) the jury found that Wedell was not negligent in respect to speed and (2) the rate of speed at which he was driving was satisfactory to the plaintiff, in fact had been acquiesced in by him.

There are numerous Wisconsin cases which recognize what is termed as the emergency rule, wherein the driver of an automobile when confronted with a sudden emergency has been exonerated from negligence. School v. Milwaukee Automobile Insurance Co., 234 Wis. 332, 291 N.W. 311, is a case quite similar on the facts. There, two cars collided, one driven by Anderson and the other by Wilpolt. The former, sued by a guest passenger, was driving on his own side of the concrete highway while the latter was driving on his wrong side. There was snow falling and the surface of the highway was icy. The two cars approached each other at a rate of speed of 15 to 20 miles per hour. (In the instant case the speed of each car was twice as great.) There was testimony that Anderson saw the Wilpolt car when it was three hundred feet away. Just before the collision Anderson, in an effort to avoid it, turned to the left and Wilpolt turned back on his own side of the highway where the collision took place. In that case, as here, the jury found Anderson negligent with respect to the control and management of his car. The trial court changed the answers of the special verdict in respect to Anderson from "yes" to "no." The Supreme Court, in discussing the situation as it pertained to Anderson, used language which reads as though it might have been written for the instant case. The court stated at page 334 of 234 Wis., at page 312 of 291 N.W.: "Anderson's determination to make this move was an exercise of judgment. He had three choices of action. He could attempt to stop his car but this involved the perils of skidding upon an icy road, and the likelihood if this did not occur that his car would be brought to a standstill only to be struck head-on if Wilpolt persisted in his course. He could turn to the right and take a chance that the shoulder was wide enough and safe enough for the purposes of this maneuver. He could, as he did, turn to the left, subject to the risk that Wilpolt would return to his proper side of the highway. It is not certain even now that either of the rejected courses of action would have avoided injury to Anderson's guests. Had he taken one of them and had an accident occurred, as good an argument for his negligence could be put forward as is here asserted. It is difficult to see how a finding of negligence can stand even assuming that in the emergency created by Wilpolt's negligent conduct he failed to take the best or safest course of action."

Schwab v. Martin, 228 Wis. 45, 279 N.W. 699, is another case similar on the facts. There, one McElroy was sued by a guest passenger for personal injuries resulting from negligent operation of the car. The McElroy car collided with a car coming from the opposite direction driven by one Martin on the wrong side of the highway. McElroy, for the purpose of escaping a collision with the car coming from the opposite direction, turned to the left, and the collision took place on that side of the highway. McElroy was found to have maintained a proper lookout but negligent in failing to maintain proper control and man-

agement of his automobile. Upon appeal by McElroy, the Supreme Court determined there was no basis for the finding of negligence. The court stated at page 51 of 228 Wis., at page 701 of 279 N.W.: "We are unable to see what move McElroy could have made that would have been more likely to avoid the accident than the course he did take. In such an emergency he was compelled to make an instantaneous guess whether the Martin car would so proceed as to make stopping, holding his course, or turning to the left his best procedure. It is nearly if not quite impossible even now to do more than guess that one of these procedures would have avoided the collision in spite of the advantage of knowing just what the driver of the Martin car finally did. In view of this, we find it impossible to support the finding of negligent management and control."

In Hoehne v. Mittelstadt, 252 Wis. 170, 173, 31 N.W.2d 150, 152, the court announced the emergency rule as follows: "We think that the emergency rule when properly applied must likewise excuse inaction on the part of the innocent driver in his proper lane of traffic when suddenly confronted with an automobile on the wrong side of the road."

A few of the many other cases in which the Wisconsin court has held that the driver of an automobile was not guilty of negligence in the operation and management of his car when confronted by a sudden emergency are Driessen v. Modor, 233 Wis. 416, 419, 289 N.W. 689; Ledvina v. Ebert, 237 Wis. 358, 367, 296 N.W. 110; Frankland v. DeBroux, 251 Wis. 210, 217, 28 N.W.2d 256.

It follows from what we have said that the answers in the special verdict of the jury as to the negligence of Wedell in the operation of his automobile, both as to maintaining a proper lookout and as to control and management, should have been changed from "yes" to "no." With Wedell thus exonerated from negligence, the cause of action should have been dismissed as to Century, the insurer of Wedell. Our holding in this respect leaves no reason to consider or decide any question relative to the assumption of risk on the part of the plaintiff.

It is argued that the trial judge erred in questioning the prospective jurors upon voir dire examination whether they or members of their families were interested in certain named insurance companies other than the defendant Century. No Wisconsin case is cited in support of this contention. In that State the law permits the joining of an insurance company in a suit of the instant character, and such being the case we see no reason why a court might not with propriety inquire of prospective jurors concerning an insurance company unnamed as well as one named. Of course, in other jurisdictions where an insurance company is not permitted to be made a party, such an examination by the court no doubt would be improper. Because of the Wisconsin practice, however, we think there is no merit in the argument.

It is also argued that prejudicial error was committed by plaintiff's counsel in his closing argument to the jury. During such argument counsel stated that he knew of his own knowledge of a case where a Federal court jury had awarded $50,000 for the loss of an eye and a case where a State court jury had awarded $10,000 to a girl for a knee injury. We agree that this argument was improper but we do not think it as vicious as counsel would have us believe. In any event, the trial court properly sustained the objection and stated to the jury, "Well I will say to the jury they may disregard that part of the argument. This case will be decided on the evidence here in court, and what verdicts were rendered in other cases haven't any bearing upon this. * * * We don't know what the facts were in those cases and you are not to consider that at all." We think this statement by the court was sufficient to remove any improper impression which the jury might have received. In any event, under the circumstances of the case, it was not sufficiently prejudicial to require a reversal.

Certain other questions of minor importance are discussed in the briefs, which we have examined and find without merit.

Lastly, we come to the highly controverted issue as to whether there is any proof to support certain elements of damage in-

cluded in the judgment awarded plaintiff in the amount of $45,000. The jury found in its special verdict that the following amounts will reasonably compensate the plaintiff for the damages which he sustained as a result of the accident: (a) medical, hospital and other expenses—$9,532; (b) loss of income—$19,555.55; (c) personal injuries, including pain and suffering—$15,-912.45. The amount of the judgment is the total of these three items. Cases are cited by the plaintiff to the effect that the jury has a wide discretion in fixing the amount of damages in a suit of this character and that a court of review is not authorized to interfere unless the amount determined is grossly excessive. If this were a general verdict, such cases would be applicable and any question as to the amount of the judgment could be disposed of in short order. However, such is not the situation. Obviously, if the amount of the judgment is sustainable it must be upon the premise that each of the three items of damage found by the jury is supported by the evidence.

Defendants make no complaint of the amount of damages found under item (c), but strenuously insist that there is no proof in support of the amount found in either item (a) or (b)—in other words, no proof in support of an award of $9,532.00 for "medical, hospital and other expenses," or in support of an award of $19,555.55 for "loss of income."

We think there is merit in the attack made upon these two items of damages as found by the jury. It is not questioned but that the plaintiff, as a result of the accident, received injuries which were serious and permanent. At the time of the accident, he was 48 years of age and was a professor of law at the University of Wisconsin Law School. In addition to this occupation, he had for several years carried on outside activities in the settlement of labor disputes. However, in view of the admitted character of his injuries, we see no point in describing them in detail.

It was shown either by stipulation or agreement of the parties that the plaintiff to the date of the trial (March 1951) had expended $3,532 for medical, hospital and other expenses, and that his loss of income to that time was $5,555.55. At the time the verdict was returned, the trial court expressed the view that there was an error in the amounts allowed by the jury in those two items and called to the attention of counsel the agreement or stipulation which had been entered into regarding such amounts. Upon assurance by counsel for the plaintiff that there was a basis in the record for the allowances as made by the jury the court permitted the amounts found to stand. A number of doctors at the trial testified in detail relative to the injuries sustained by the plaintiff but there is not an iota of evidence as to what, if any, medical or hospital expenses plaintiff will be required to meet in the future and no inquiry was made in that respect. Plaintiff states in his brief, "No doctor could be expected to say now what these future medical expenses will be," but at the same time argues that it was within the province of the jury to so determine.

■ The medical testimony reveals that the doctors held out little, if any, hope that plaintiff's condition would improve. The plaintiff, in reviewing the medical testimony with the view of supporting his contention that future medical and hospital expenses will be required, summarizes the situation in his brief thus: "The testimony of Dr. Greene is perfectly clear that it considered it good procedure to have an exploratory operation of the nerve in connection with the foot drop, and likewise that an operation to stiffen the joint might well be advisable." Assuming that the operations mentioned are at some time in the future thought desirable, it is not discernible how a jury could have the faintest idea whether the medical expense connected therewith would be $500 or $5,000, and whether such operations would require hospitalization for one week or fifty weeks. We think that $6,000.00, the amount awarded for future medical and hospital expenses, was based solely on speculation and guess and that it cannot stand.

The record as to the loss of future income is just as unfavorable to the plaintiff. Plaintiff's testimony shows that from Feb-

ruary 21, 1950 (the date of the accident) until mid-June of that year he was unable to teach and that his loss in salary was $3,555.55. (His salary during this period was paid him by the University as a gratuity but is admitted to be a recoverable item.) He also, during the same period, lost an additional $2,000 because of his inability to do the extracurricular labor relations work in which he was engaged. Thus, the total loss of income due to the accident was $5,555.55. The jury, however, allowed him $19,555.55, of which amount $14,000 obviously was for the loss of future income. In the fall of 1950, plaintiff returned to his work at the University and during most of the year carried on his extra work in the labor relations field. With reference to the latter he testified: "With respect to my labor relations work, I have been able to perform that substantially as well as before, except for trips that involved long travel, up to now. To indicate how substantially I have been able to perform my labor relations work, I earned approximately twice as much on labor relations work during the year 1950 when I was incapacitated as I did during 1949 prior to this accident, if that is what the figures show." In fact, the record shows that in the latter work his earnings were greater in 1950 than in any previous year. For instance, in 1948 he earned from that source $3,500, in 1949, $2,620, and in 1950, $5,500, $850 of which was earned prior to and $4,650 after the date of the accident.

We think it is true, as pointed out by the plaintiff, that the right to recover for future loss of income is not necessarily dependent upon the amount of income earned either before the accident or after. The test seems to be whether there has been an impairment of capacity to earn in the future. As was stated in Hoefer v. Last, 221 Wis. 102, 113, 266 N.W. 196, 201: "When proof convincingly establishes a material impairment of future earning capacity, as the result of injury to a person whose earning capacity was theretofore not impaired, the mere fact that he was not actually earning during a period immediately preceding his injury, does not defeat his right to recover for his probable future loss in earnings as the result of his impaired earning capacity."

Again, there is no proof that plaintiff's future earning capacity has been impaired; in fact, the evidence indicates that it has not, and this notwithstanding the fact that he is permanently and seriously injured. There is no proof that his life expectancy has been lessened as a result of his injuries or that he will not be able in the future to carry on and perform the same character of work as previously, without diminution of income. It must be kept in mind that plaintiff under item (c) was awarded damages for personal injuries, including pain and suffering, in the amount of $15,912.45, and that the basis of this award cannot be used to bolster or support the amount of the allowance of the two items complained of.

█ It follows from what we have said that the damages allowed by the jury under item (a), medical, hospital and other expenses, were excessive in the amount of $6,000, and those allowed under item (b), loss of income, were excessive in the amount of $14,000, or a total of $20,000 for which there is no support in the evidence.

The judgment as to the defendant Century Indemnity Company is reversed and remanded, with directions that the complaint as to it be dismissed. The judgment as to the defendants Frances Bard, administratrix of the estate of Stanley Bard, and Irving W. Rice & Co., Inc., is directed to be vacated and a judgment entered in favor of the plaintiff and against such defendants in the sum of $25,000.