24 Wis.2d 420 (1964)
DOMBECK (Carol) and others, Plaintiffs,
v.
CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Defendant and Respondent:
DOMBECK (Russell), Plaintiff and Appellant:
DOMBECK (Richard) and another, Defendants and Appellants.
Supreme Court of Wisconsin.
June 3, 1964.
June 30, 1964.
*425 For the appellant Russell Dombeck there was a brief by Kaftan, Kaftan & Kaftan of Green Bay, and oral argument by J. Robert Kaftan.
For the appellants Richard Dombeck and the Integrity Mutual Insurance Company, there was a brief by Cornelisen, Denissen, Kranzush & Kuehn, and oral argument by David J. Condon, all of Green Bay.
For the respondent there was a brief by Welsh, Trowbridge, Bills, Planert & Gould of Green Bay, and Bender, Trump, Davidson & Godfrey and Rodger S. Trump, all of Milwaukee, and oral argument by Rodger S. Trump.
CURRIE, C. J.
The following issues are presented by this appeal:
(1) Did the trial court err in holding that any negligence of the Railroad Company with respect to lookout was not causal as a matter of law?
(2) Should questions inquiring whether the Railroad Company was causally negligent with respect to speed have been submitted in the special verdict?
(3) Can the jury's finding apportioning 50 percent of the total aggregate causal negligence to the Railroad Company be sustained on the basis that the jury was thereby finding the railroad causally negligent with respect to speed?
(4) Because of plaintiff Russell Dombeck having sponsored his son Richard's application for a driver's license *426 under sec. 343.15 (2), Stats., was Richard's negligence thereby imputed to Russell Dombeck so as to preclude the latter from recovering any damages against Richard and Integrity Mutual?

Lookout Issue.
The trial court set aside the jury's finding of causal negligence with respect to lookout on the part of the Railroad Company on the ground that such negligence was not causal as a matter of law. This determination was grounded upon this court's decision in Hynek v. Kewaunee, G. B. & W. R. Co. (1947), 251 Wis. 319, 29 N. W. (2d) 45.
Richard Dombeck testified in part as follows: He was driving at a speed of five to eight miles per hour as he approached the crossing. When he first looked to the south and became aware that a train was approaching, the car bumper was close to the west rail of the railroad track and that from his position in the car he was nine to 10 feet from the crossing. His excuse for not looking sooner was that a high bank along the right-of-way obscured his vision up to that point. He figured because of the slippery condition of the roadway that if he attempted to stop he would skid onto the track. Therefore, he accelerated the car in an attempt to get across the track ahead of the train.
At the time, the diesel locomotive of the train was being operated by the fireman who was seated in the engineer's seat on the right or east side of the cab. The engineer was seated on the left side which was the side from which the Dombeck car approached the crossing. While the fireman was afforded a good view of the crossing when the train was some distance south of it, the hood of the locomotive obscured his view to the west as the train came closer to the crossing. The engineer died prior to trial and we do not know when he first saw the approaching Dombeck *427 car. The fireman testified that when the locomotive was about 50 feet from the crossing the engineer shouted, "Plug her!" In railroad parlance this means to set the emergency brakes immediately, which the fireman did. The fireman did not himself see the Dombeck car until the locomotive was approximately 30 feet from the crossing at which time the car was already on the track.
Richard Dombeck's testimony that his view of the approaching train was obscured by the bank along the west side of the right-of-way is disputed by the photographs taken of the crossing taken two days after the accident. These pictures clearly indicate that the locomotive would have been visible to Richard, if he had looked, long before he reached the point when he testified he made his first observation. This is because the height of the locomotive was 14 feet, six inches above the track and the bottom of the headlight was 11 feet, three inches above the track. Likewise the Dombeck car could have been seen by the engineer before the train reached a point 50 feet from the crossing.
In considering the evidence bearing on the Railroad Company's negligence as to lookout, independent of the element of causation, it is rather difficult to sustain the jury's finding in that respect. This issue is confined to the lookout of only two railroad employees, the fireman and the engineer. The train may well have been in such proximity to the crossing when the Dombeck car first came into view that the forward part of the locomotive entirely obscured the view of the fireman. The engineer may have seen the car prior to shouting, "Plug her!", but it was not until he so shouted that it would be obvious to anyone that the car proceeding at its very slow speed was not going to stop. Furthermore, the engineer being deceased at time of trial, a presumption arises that he exercised due care. Ray *428 v. Milwaukee Automobile Ins. Co. (1939), 230 Wis. 323, 327, 283 N. W. 799; Henthorn v. M. T. C. Corp. (1957), 1 Wis. (2d) 180, 187, 83 N. W. (2d) 759, 79 A. L. R. (2d) 142. While this presumption did not in itself constitute evidence, and might be rebutted by any evidence in the case from which could be reasonably drawn an inference of negligent lookout on the part of the engineer, appellants have pointed to no such evidence. However, even assuming that the finding of negligent lookout against the Railroad Company is supported by credible evidence, it could not be causal under our holding in Hynek v. Kewaunee, G. B. & W. R. Co., supra.
In the Hynek Case the collision occurred at a city crossing, at 7 o'clock in the evening. It was dark and snowing. The Hyneks were familiar with the crossing and reduced their speed to seven or eight miles per hour as they approached it. They testified that they looked and saw no train, neither did they hear one. Mr. Hynek increased his speed to cross the tracks, and was struck on the right side while crossing. On the issue of the train's lookout the testimony of the fireman was that he saw the headlights of the Hynek car when it was 25 to 50 feet from the track, at which time he called for the application of the emergency brakes. The train traveled about 339 feet before it was brought to a full stop. The jury found the railroad company guilty of negligence lookout and apportioned 27½ percent of the aggregate negligence to it. On appeal this court reversed and made the following pertinent statements (pp. 323, 324):
"Even if the fireman had seen, or in the exercise of due care ought to have seen the Hynek car sooner, the evidence discloses no facts that would create a legal duty in him to do any more than he did. There was nothing at the crossing to obstruct the automobile driver's view of the tracks. *429 The Hynek car at all times was moving at a rate of speed which would enable the driver to stop at a point where he would be free from danger. If the fireman had observed the approach of the car back of its twenty-five to thirty-foot position from the track, he would have seen nothing to indicate a probability that the car would proceed over the tracks while the train was moving. Indeed, the driver of the car testified that when he was about thirty to thirty-five feet from the track he reduced his speed to seven or eight miles per hour. This would indicate to anyone seeing him that he was preparing to stop to let the train go by. Instead, when he was an estimated twelve to fifteen feet away he accelerated his speed and the collision occurred.
"When all of these facts are considered in connection with the rule that those in the engine of a train have the right to assume that a person approaching the track will reasonably exercise his senses of sight and hearing and act appropriately, it is evident that the engine crew of this particular train, prior to the time of applying the emergency brake, would have had no occasion to assume that danger of a collision was developing. Nothing calling for an effort to stop the train happened before the fireman called for the emergency stop."
In the present case, as in Hynek, the collision occurred at a familiar city crossing, on a dark, wintry evening. Similarly, Richard reduced his speed as he approached the crossing, but accelerated upon seeing the train. With respect to lookout, Richard testified that at the time he looked and saw the train it was too late to attempt to stop. On the question of the train's lookout, the fireman, who operated the train, testified that he first saw the Dombeck car when it was on the tracks and when the train was 30 feet from the crossing. At this time the emergency brakes had already been applied. There was also testimony that the engineer must have seen the Dombeck car when the train was 50 feet from the crossing because he at that point shouted, "Plug her!
*430 In view of the great similarities between Hynek and the present case, the court holds that there is no evidence of causal negligence with respect to lookout. Therefore, the trial court properly held that any failure of lookout on the part of the Railroad Company was not causal as a matter of law.

Failure to Submit to Jury Issue of Causal Negligence as to Train's Speed.
Appellants Richard Dombeck and Integrity Mutual, in their motions after verdict, did not move for a new trial on the ground that the verdict should have contained questions inquiring as to whether the Railroad Company was causally negligent with respect to speed. Therefore they cannot raise such issue on this appeal. Wells v. Dairyland Mut. Ins. Co. (1957), 274 Wis. 505, 518, 80 N. W. (2d) 380; Huffman v. Reinke (1955), 268 Wis. 489, 491, 67 N. W. (2d) 871. However, appellant Russell Dombeck did move for a new trial on this ground and raises the issue on this appeal. While his son Richard's negligence is imputed to him by sec. 343.15 (2), Stats., insofar as third parties such as the Railroad Company are concerned, a finding of causal negligence with respect to speed against the Railroad Company might have affected the jury's answers to the two subdivisions of the comparative-negligence question where 50 percent of the aggregate causal negligence was apportioned to both Richard Dombeck and the Railroad Company. However, even if in such event the jury would have apportioned less than 50 percent of the aggregate causal negligence to Richard, a serious question would be presented whether his causal negligence was not at least 50 percent of the whole as a matter of law, which, for the reasons hereinafter stated, we find unnecessary to decide.
The matter of railroad train speeds at grade crossings is in the exclusive jurisdiction of the public service commission. *431 See sec. 192.29 (1), Stats.[1] It is agreed that prior to the accident the commission had made no order setting a maximum speed for trains at the instant crossing. This statute in its present form, conferring such jurisdiction upon the commission to fix speed limits at grade crossings, was enacted in 1949. Prior to that enactment the statute itself fixed maximum speed limits at grade crossings in villages and cities. See sec. 192.29 (1) and (2), Stats. 1947. In the instant case the Railroad Company contends that in the absence of any order of the commission with respect to this crossing, no speed could be held negligent. While this contention has some merit we are of the opinion that there are at least two situations in which train speed *432 at a grade crossing might constitute negligence even though the commission had made no order with respect to a particular crossing. One of these was pointed out in McLuckie v. Chicago, M., St. P. & P. R. Co. (1959), 5 Wis. (2d) 652, 657, 94 N. W. (2d) 182, where this court held that the peculiar or unusual circumstances there prevailing made it the duty of the railroad to conform its speed to standards of due care. In the instant case we doubt if the crossing presented such peculiar or unusual circumstances as to call for invoking the exception enunciated in McLuckie, but find it unnecessary to decide this point. Another situation in which a railroad company might be held guilty of negligent speed at a grade crossing, even though the commission had not established a speed limit for such crossing, was alluded to in Schulz v. Chicago, M., St. P. & P. R. Co. (1952), 260 Wis. 541, 549, 51 N. W. (2d) 542, where the railroad company had by its own rule established a speed limit for its trains which was violated.
The trainmaster testified that the maximum permissible speed established by defendant Railroad Company for a freight train was 40 miles per hour. While this is not in the company rule book it is governed by a timetable or train order. Although the great weight of the evidence is that the train was traveling at a speed of 35 to 40 miles per hour as it approached the crossing, plaintiff Beulah Dombeck testified it was then traveling at a speed of 65 miles per hour. She made this observation while standing in the doorway of the Dombeck home.
Notwithstanding the evidence as to speed we conclude that under the facts of this case, assuming that the speed of the train was negligent, such speed as a matter of law could not be causal. In order to be causal the train's speed must either have misled Richard Dombeck, the driver of the car, or it must have interfered with the control and management of the train to the extent of rendering it probable *433 that such control and management would have otherwise been effective to have avoided the collision. The evidence here excludes both of these hypotheses.
Richard's testimony clearly excludes the possibility that he was misled as to the speed of the train and that he attempted to cross in front of it on reliance that it was traveling at a lesser speed than it actually was. This is apparent from this verbatim extract taken from his testimony:
"Q. When you saw the train, what did you do then? Did you try to put on the brakes, or did you push on the accelerator? A. I pushed on the accelerator.
"Q. Trying to get across? A. To try to get across, yes.
"Q. The reason you did that, as I understand it, was because of the fact that you thought you couldn't stop due to the weather a short distance at all? A. That's right.
"Q. Because of the conditions of the highway? A. Yes."
The foregoing clearly establishes that the reason Richard attempted to cross the track by accelerating instead of trying to stop was because he had concluded that he could not stop before reaching the track. Speed is not causal merely because the train arrived at the crossing the instant it did while if it had been going slower the car might have safely crossed ahead of it. See Baker v. Herman Mut. Ins. Co. (1962), 17 Wis. (2d) 597, 602, 117 N. W. (2d) 725, wherein this court declared:
"This court has never held that excessive or unlawful speed is causal merely because it places the vehicle at a particular place at a particular time. Excessive speed is causal, however, when it prevents or retards the operator, after seeing danger, from slowing down, stopping, or otherwise controlling the vehicle so as to avoid a collision."
The second sentence of the above-quoted extract is apposite with respect to the question of whether, if the train *434 had been traveling at 40 miles per hour instead of a speed up to 65 miles per hour as testified to by Mrs. Dombeck, the throwing on of the emergency brakes at the point where they were applied would have slowed down its speed sufficiently to have enabled the car to safely cross the track. Appellants point to the evidence that all but the rear two or three feet of the car had gotten across when struck by the locomotive. As previously herein pointed out there is no evidence upon which to base a reasonable inference that the engineer ought to have observed that the slow-moving Dombeck car was not going to stop for the crossing until he shouted to the fireman, at which time the front of the train was 50 feet from the crossing. Some allowance must be allocated to the fireman's reaction time on hearing such shouted order before he could throw the emergency brakes into operation. As it was, the train traveled approximately 400 feet after the emergency brakes were applied before coming to a stop. The fireman testified he could not apply the emergency brakes within a third of a second. A vehicle traveling at 40 miles per hour travels at the rate of 59 feet per second. Thus at that speed the train would have traveled more than 20 of the 50 available feet to the crossing before the brakes could have been applied by the fireman. There is no evidence in the record that the application of the emergency brakes at a point 30 feet from the crossing would have reduced the train's speed sufficiently to have avoided the collision. We think the probabilities are that it would not. In any event a jury should not be permitted to speculate as to this. The situation is different with respect to the operation of automobiles where it can be assumed that jurors possess some knowledge of stopping distances and effectiveness of automobile brakes. This is not the situation with respect to the operation and stopping of trains.
*435 Therefore, we conclude that the trial court did not err in failing to submit a jury question as to the train's speed since the evidence could not support a finding that any such speed was causal.

Inclusion of a Finding as to Speed in Jury's Answer to Comparative-negligence Question.
Appellants Richard Dombeck and Integrity Mutual contend they are entitled to a judgment against the Railroad Company on their cross complaint for contribution. Although no question with respect to the train's speed was included in the verdict, the trial court did instruct the jury with respect thereto. Because of the latter, appellants ask this court to hold that the jury's apportionment of 50 percent of the aggregate causal negligence to the Railroad Company can be sustained on the ground that the jury found that the Railroad Company was causally negligent with respect to speed. We find no merit to the contention that it must be assumed that the jury in answering the comparative-negligence question must have found that the train was being operated at an excessive speed and that such speed was causal. No such assumption can be made. Moreover, our determination that any negligence as to the train's speed could not be causal would in any event prevent these appellants from prevailing on their cross complaint with respect to contribution.

Imputation of Son's Negligence to Father in Action by Father Against Son.
The trial court denied appellant Russell Dombeck's motion for judgment against defendants Richard Dombeck and Integrity Mutual on the ground that Richard's negligence must be imputed to his father under the provision of sec. 343.15 (2), because the latter had sponsored Richard's *436 application for a driver's license.[2] This statute provides in part:
"Any negligence or wilful misconduct of a person under the age of 18 years when operating a motor vehicle upon the highways is imputed to the person who signed the application for such person's license."
The question of whether this statute is applicable to an action by the sponsoring parent against the minor whose driver's license application was signed by the parent is one of first impression in this state. The Seventh circuit court of appeals, however, did pass on this identical question in Gilbertson v. De Long (7th Cir. 1962), 301 Fed. (2d) 284. By a split decision that court determined that no exception was to be read into the statute which would exclude its application to an action between sponsoring parent and child. The dissenting opinion asserted that the legislative purpose was to protect the public from damage caused by youthful drivers and not for the protection of such youthful drivers against liability for their own negligence.
Given the broad interpretation placed upon this statute by the majority opinion in the Gilbertson Case, a parent would be precluded from recovering for the tortious act of a child whose driver's license the parent had sponsored where a principal-agent or joint-venture relationship existed. *437 The general rule is that a principal may recover from his agent for loss or damage caused the principal by the negligent act of the agent. Restatement, 2 Agency (2d) p. 911, sec. 401; 3 Am. Jur. (2d) Agency, p. 583, sec. 202; 3 C. J. S., Agency, p. 46, sec. 162. The negligence of the agent will be imputed to the principal in an action by the latter against a third person, or by a third person against the principal. 38 Am. Jur., Negligence, p. 922, sec. 236. See also Restatement, 2 Torts, p. 1267 et seq., secs. 485, 486; Prosser, Law of Torts (2d ed.), p. 299, sec. 54. However, the negligence of the agent is not to be imputed to the principal in an action by the principal against the agent. Archer v. Chicago, M., St. P. & P. R. Co. (1934), 215 Wis. 509, 515, 255 N. W. 67, 95 A. L. R. 851; 8 Am. Jur. (2d) Automobiles and Highway Traffic, p. 223, sec. 672. Likewise, while the negligence of one of two joint venturers is imputed to the other in actions against third persons, there is no such imputation where the action is between the joint venturers themselves. Johnsen v. Pierce (1952), 262 Wis. 367, 373, 55 N. W. (2d) 394; Klas v. Fenske (1946), 248 Wis. 534, 544, 22 N. W. (2d) 596; Restatement, 2 Torts, p. 1273, sec. 491.
This court stated in Employers' Mut. Fire Ins. Co. v. Haucke (1954), 267 Wis. 72, 75, 64 N. W. (2d) 426, that the legislative purpose of sec. 343.15 (2), Stats., is to "protect the public from damage caused by the negligent operation of vehicles by youthful drivers." It accomplishes this purpose by imputing the negligence of the sponsored minor driver to the sponsoring parent, guardian, or employer, where without the statute such imputation would not result because of the lack of a principal-agent or jointventure relationship. At the time of the enactment of sec. 343.15 (2), Stats., in 1941 (then numbered sec. 85.08 (9) *438 (b)), the legislature probably gave no thought to a situation where a sponsoring parent might be suing the sponsored minor for damages caused the parent through the negligent operation of a motor vehicle by the sponsored minor. This is because of the then-prevailing rule in Wisconsin that a parent could not sue his unemancipated minor child in tort. See footnote 2, supra. However, a majority of this court considers it would work an unreasonable and absurd result if the statute were to be construed to abrogate, as between sponsoring parent, guardian, or employer and sponsored child, the rule that the negligence of an agent or joint venturer is not to be imputed to his principal or other joint venturer in an action between the parties. Thus we invoke the rule of statutory interpretation that a statute should not be construed to work an absurd result, even when the language seems clear and unambiguous. Connell v. Luck (1953), 264 Wis. 282, 58 N. W. (2d) 633; Laridaen v. Railway Express Agency, Inc. (1951), 259 Wis. 178, 47 N. W. (2d) 727; Pfingsten v. Pfingsten (1916), 164 Wis. 308, 159 N. W. 921.
In view of the foregoing, we determine that, with respect to appellant Russell Dombeck's causes of action against defendants Richard Dombeck and Integrity Mutual, Richard's negligence is not to be imputed to his father. This requires that portion of the judgment which dismissed Russell Dombeck's complaint against these defendants be reversed, and that the cause be remanded for the entry of a proper judgment awarding him judgment against such defendants for the damages awarded him by the verdict for medical and miscellaneous expenses incurred by him for the injuries to Carol, for the funeral expenses incurred by him for Gail, and for one half the damages awarded for the wrongful death of Gail, together with costs and disbursements.
By the Court.That part of the judgment which dismissed plaintiff Russell Dombeck's complaint against defendants *439 Richard Dombeck and Integrity Mutual Insurance Company is reversed, and cause remanded for the entry of a judgment in behalf of this plaintiff against these defendants consistent with this opinion; in all other respects the judgment is affirmed.
NOTES
[1] This statute provides, "Upon petition to the public service commission by the governing body of any city or village or by any railroad corporation alleging that any railroad crossing of one or more public highways or streets in such city or village is dangerous to human life and that public safety requires a designation of the maximum speed of a train over such crossing or crossings, or that an order previously made by the commission should be modified, the commission shall give notice to the parties in interest and order a hearing thereon in the manner provided by section 196.26. If, after such hearing, the commission shall determine that the crossing or crossings described in such petition are dangerous to human life, it may by order determine what maximum speed of a train over such crossing is reasonably required by public safety and is consistent with the public need for adequate and expeditious passenger and freight service by railroad, having due regard for other orders entered by the commission and to practical railroad operating conditions. Where the commission has so designated the maximum speed of any train or trains over such crossing or crossings, such rate of speed shall be the lawful maximum speed at which any train affected by such order can be operated over such public highway or street crossing, until changed by subsequent order of the commission. Every railroad corporation violating any order entered under this subsection shall for every violation forfeit to the state not less than $10 nor more than $100. The jurisdiction over train speeds hereby vested in the commission shall be exclusive, but any order entered by the commission hereunder shall be subject to judicial review in the manner provided by chapter 227."
[2] The issue has not been raised on this appeal as to whether in view of Goller v. White (1963), 20 Wis. (2d) 402, 122 N. W. (2d) 193, a parent can now maintain an action against an unemancipated minor in Wisconsin for a tort committed prior to the decision in that case. The prior rule was that a suit could not be maintained by a parent in tort against an unemancipated minor. Wadoz v. United National Indemnity Co. (1957), 274 Wis. 383, 392, 80 N. W. (2d) 262; Fidelity Savings Bank v. Aulik (1948), 252 Wis. 602, 605, 32 N. W. (2d) 613. Because this issue is not before us on this appeal our opinion is not to be interpreted as having passed on the same by implication.